IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ROBERT "TY" KIMZEY,

    Plaintiff,

vs.                                      Case No. 15-1369-JTM

METAL FINISHING CO., INC, *et al.*,

    Defendants.

MEMORANDUM AND ORDER

    Plaintiff Tyler Kimzey is a former employee of Diversified Services, Inc. (DSI). All individuals who are staffed with DSI are employees of Syndeo, Inc., and DSI's parent company is Metal Finishing Corporation (MFC). Kimzey has sued DSI, Syndeo, MFC, and his former supervisor, Dale Crouch, for violating his rights under the Family and Medical Leave Act (FMLA). The defendants have moved for summary judgment on two of those claims: Count 1, alleging interference with FMLA rights against defendants Syndeo, DSI, Crouch and Metal Finishing, and Count 3, alleging retaliation for making an FMLA claim against DSI and Metal Finishing.

    Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party

need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

***Findings of Fact***

Kimzey began working at DSI on January 27, 2007. Dale Crouch, Kimzey's supervisor, has been the Plant Manager at DSI since 2011.

Kimzey had multiple job duties, including working in maintenance, shipping and receiving, and processing. He has "bounced around" frequently between working in these areas, often times daily. Regardless of whether he was working in maintenance, shipping and receiving, or processing, Kimzey received the same pay and had the same opportunities for advancement.

At one point during his employment, Kimzey was the processing "lead." This title

did not bestow supervisory authority over anybody, and he was not responsible for hiring or firing employees. It also did not provide higher compensation. When Kimzey was moved into the position of processing lead, he was not given paperwork to fill out, or a formal job description. Kimzey was not the lead when he began FMLA leave.

In 2015, Kimzey injured his shoulder in a motorcycle accident. He had shoulder surgery about three weeks after the accident. Kimzey testified in his deposition that "[f]rom the time that I had the wreck to the time I reported back at work, I was stuck in a chair and couldn't move." Kimzey believes it is possible he also tore his rotator cuff in the accident.

Kimzey took eight weeks of FMLA leave after the accident. He testified he did not have any difficulty obtaining FMLA leave, and nobody criticized him for taking it.

Kimzey testified in his March 29, 2016 deposition that if he raises his arm all the way up it "just sends you sharp pain. I mean, you hit a certain point." Kimzey was then asked if he had to "actually lift something, it would be more painful than just raising it?" He responded: "Well, I can lift whatever, but it's just when you get in a certain point over your head."

Kimzey returned to work on June 15, 2015. He gave Crouch a physician's certification to return to work the Friday before, and Crouch told Kimzey "to return to the processing line." Kimzey told Crouch that "sometimes it [his arm] hurts when you get it way above your shoulder." The doctor gave Kimzey some exercises and told him that if he still had pain in three weeks, he should see him again. Kimzey told Crouch that he might have follow-up surgery if he still had pains in his shoulder, and showed Crouch his scar.

Kimzey states in an affidavit that his physical condition would not prevent him from performing the maintenance, shipping, and receiving work he did before the FMLA leave. He avers that he never told Crouch that he could not do his previous work.

There is a fact dispute as to whether Kimzey at this meeting asked Crouch not to be relieved from any lifting when he returned to work. Crouch says that Kimzey did; Kimzey

says he did not.

There is another dispute as to whether Crouch told Kimzey to report to the so-called small end of the processing line, which handles smaller parts that an employee can more easily manage. Kimzey avers Crouch did not tell him to work the small end of the line, while Crouch states that he did.

Crouch testified that he wanted Kimzey on the processing line because it would be the easiest position for him to work and to give him more recovery time.

It is undisputed that, after returning from FMLA leave, Kimzey's rate of pay, shift, and employment benefits remained the same. However, there is a dispute between the parties as to the general nature of Kimzey's work before and after the FMLA leave.

Kimzey avers that before taking FMLA leave, he spent almost all of his time in maintenance and shipping and receiving. He almost never worked on the line unless it was to tell other processors in what order to do parts. Now and then he would jump in and help, but he had not worked on the line for eight hours a day for several years.

His supervisor Crouch testified that before the leave Kimzey worked about 50% of his time doing maintenance, 20% doing shipping and receiving, and 30% doing processing. Kimzey seldom worked an eight-hour day on the processing line.

Plaintiff cites Crouch's deposition for the idea that the maintenance position also has more autonomy, and the shipping position more prestige. Crouch's testimony is ambiguous. He states it was "an interesting question" whether processing or maintenance was more autonomous, testifying initially that it was "[p]robably the line," before also answering "I'm going to say maintenance, I guess." Crouch agreed that people in the shop think shipping has more status, but that "I don't know that any of them has any more status than the other in my eyes."

Kimzey spent the first several years at DSI working on the line. According to the plaintiff, the processing line requires working with acid and exposure to heavy fumes.

While Kimzey worked on the line, Kimzey was burned on his skin and the acid put holes in his clothes. When he worked shipping and receiving and maintenance, he could work burn-free. Shipping and receiving is much cleaner work than line work. Maintenance is dirtier.

When Kimzey began his FMLA leave, his line work comprised matters such as calling a meeting to give the line workers tips on how to work faster or reordering the order in which parts were processed.

The physical demands of line work upon his return to work are greater than the work Kimzey was doing when began his FMLA leave. Kimzey had worked on the line for years and expressed relief at moving into different work as the lifting takes a toll on a worker's body. Even when working small parts, an employee can get called in to help lift large parts. In fact, Kimzey's partner died working on the line. Line workers use wires and pliers over and over, causing repetitive wrist injuries. The work on the line is physically difficult. The job description for processing requires 50 lbs. lifting.

When working maintenance, Kimzey used a variety of personal and company tools. He fixed machines, he cleaned, he did other chores. On the line, he only used pliers and wire cutters.

Kimzey states that when working maintenance, he could leave the plant while on the clock to run errands for the company. Kimzey went to the hardware store, the lumber yard, the auto parts store, and to the gas station to get gas for the weed eater or the hi-lift. When Kimzey went to these businesses, he represented DSI. He bought things and charged them to DSI's account with his signature. People there recognized him as the "DSI maintenance guy." He interacted with others on behalf of DSI. He could not do any of these things when he worked on the line. According to Kimzey, when he was in processing he was required to stay on the line and never left the property while on the clock.

Kimzey states that when he did work in shipping and receiving, he would go to that

position when the head of shipping left to go home. In shipping and receiving he interacted with customers on behalf of DSI. Kimzey had responsibility for documenting parts that came in damaged. He had discretion to decide if documenting damaged parts needed to be done. He was also certified as a forklift driver and regularly drove a forklift. Working on the line, he did not make those decisions, drive a forklift, or interact with customers. He also had more autonomy before taking FMLA leave in deciding what work needed to be done.

      Kimzey had training in handling hazardous wastes and was a mechanic. He used these skills when he worked in maintenance, but not on the processing line.

      As noted above, according to Kimzey, the processing line requires repetitive lifting day in and day out. It wears one down more than maintenance work or work in shipping and receiving. Generally, Kimzey's work at the time he went on leave was a better job with much more responsibility, variety, and use of judgment and skills than the work after returning from leave, which involved taking eight hour shifts on the processing line only.

      Before his leave, other processors listened to Kimzey when he told them what needed to be done or showed them. When he returned from leave, the lead asked him for tips on how to do his lead job, but Kimzey no longer had responsibility for being a leader on the line.

      The defendants' Reply denies many of the facts asserted by Kimzey, primarily relying on Crouch's affidavit. Crouch states, for example, that maintenance, shipping, and processing were all equal in terms of how physically taxing they were. His affidavit also states that Kimzey was not required to always stay on the line while he was on the clock.

      Defendant notes that Kimzey is somewhat inconsistent about how much time he spent at each position before he went on FMLA leave. At one point in his Response, Kimzey states that he worked maintenance "at least half of the time." (Dkt. 63 at ¶ 11). Elsewhere, he states that he "was spending about half of his time doing shipping and

receiving." (*Id*. ¶ 14). This would create a contradiction if Kimzey's statements were to be read to infer that he had no time at all for working the processing line, which he concedes he did on occasion. But the statements could also be read to mean that he spent very little time working on the processing line, a position which is consistent with the plaintiff's general argument.

Defendant Crouch testified that at this point, it would be impossible to reinstate Plaintiff to his former position as his bringing this lawsuit has created hostile attitudes against him among his co-workers.

About three days after Kimzey returned to work, seven people reported to Crouch that Kimzey was "running his mouth," and Crouch suspected that Kimzey was complaining because of having to work the processing line.

Crouch does not believe there were any witnesses to the conversation he and Kimzey had that led to Kimzey's employment ending.

Both parties cite Crouch's deposition testimony regarding the conversation he had with Kimzey immediately before his termination. Crouch testified that Kimzey

> said he was planning on giving me two weeks' notice. My response was, After all the crap I put up with, and I didn't say shit. And he said, You take a man's pride and his self-esteem, you flush it down the toilet, and that's why I'm quitting.

Q. He said, And that's why I'm quitting?

A. And I said, Get your stuff and get the F out.

....

Q. .... Did you say, Are you fucking kidding me, Ty?

A. I don't remember. I may have. ....

Crouch was also asked about what he meant about putting up with crap by Kimzey:

Q. Now, when you said, After I put up with your crap, what crap were you talking about?

A. Missing work –

Q. Okay, anything else?

A. – over a couple year period. He was always borrowing money. He was – and we have an employee fund. I wasn't giving him personal money. He came to me weekly to borrow money. He frequently asked for his check early. I would give it to him because they were going to shut off his power or they were going to — whatever. I just felt like I had done a lot for Ty.

(Crouch dep. at 50, 75.).

Plaintiff also notes Crouch's testimony that when Kimzey was at work, he worked harder than any one else. Crouch's actual deposition testimony, however, was much more circumspect:

A. When Ty was good, he was good. And that was about 60 percent of the time. Maybe 70.

Q. So 60 to 70 percent of the time, he did good work for you.

A. Yes.

Q. He thinks he works harder than anybody else[?]

A. He does.

Q. Were there times that was true?

A. There were times — he cared about his job. If the trash was full, he'd empty it. If somebody needed help, he'd help them. He didn't need [to be] prompted to do so. When Ty was on, he was a good employee, about 60 percent of the time.

(Id. at 58).

Two days before the termination, Crouch had filled out a form stating that Kimzey was eligible for re-hire.

In his deposition, Kimzey testified that Crouch was a fair supervisor when he worked at DSI, that Crouch never treated him differently than any of the other employees, and that Crouch would often give him pay advances. He agreed no one at DSI ever used the term demotion when discussing his employment there upon his return from FMLA leave.

Kimzey left employment with defendants on June 17, 2015, and the defendants have

never offered to reinstate him. After the termination, the defendants did not want Kimzey to return to work, and nobody told or advised Kimzey to return to work at DSI.

MFC HR Director Kevin Dean wrote an email the day after the termination:

> Another point that Dale and I spoke briefly about yesterday was Ty's lifting ability and self-imposed weight restriction upon returning to work. I have not personally seen his release yet, but Dale spoke about Ty's verbal request not to lift heavy weight. This alone would preclude him from working in the same maintenance position where he was working for over a year before his leave. (emphasis added) I believe that this should be stressed and could be a key factor in a decision about his FMLA if this was to proceed to some legal battle.

***Conclusions of Law***

The court will grant summary judgment as to plaintiff's retaliation claim, which rests on the claim that the defendants were in fact "willing to re-employ" Kimzey, but withdrew "their offer ... was apparently withdrawn after Plaintiff made an FMLA claim." (Dkt. 54, at ¶ 38-40). In order to succeed on an FMLA retaliation claim, the plaintiff must show that 1) he engaged in a protected activity; 2) the employer took an action that a reasonable employee would have found materially adverse; and 3) there exists a causal connection between the protected activity and the adverse action. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006).

There is no evidence to support the retaliation claim advanced in Count 3 of the plaintiff's Amended Complaint. The uncontroverted admissible evidence establishes that the defendants in fact were not willing to rehire Kimzey once the termination occurred, and that no offer of reemployment was ever communicated to the defendant. The only evidence suggesting a contrary conclusion is the second of two letters from a Jean Flora Nacchio, dated September 14 and 29, 2015, indicating that the defendants had unsuccessfully left messages with Kimzey or his wife, and that Kimzey had not returned these calls.

Both letters were written by Nacchio as a claims specialist working for defendants' insurer. The first requests "a detailed demand package," and the second explicitly

references the "demanded $275,000 in settlement" which plaintiff apparently submitted in the interim. Nacchio concludes that "the figures you assert appear to be exaggerated," and the claim subject to "a serious factual dispute."

The plaintiff argues that the Nacchio letters are admissible by citing *Rural Water Dist. No. 4 v. City of Eudora*, 659 F.3d 969, 986-87 (10th Cir. 2011). That case, however, is grounded on facts not present here. At issue in the cited case was whether letters written by an attorney might constitute an illegal threat of curtailment of water service, in violation of the Agricultural Act of 1961, § 7 U.S.C.A. § 1926(b). The Tenth Circuit stressed that the trial court had reviewed the records and could "not find evidence of 'discussions between these two parties trying [to] work this out, trying to settle it, [or] trying to compromise,'" but rather found evidence suggesting Eudora had staked out its position that it would ultimately enforce its appraisal rights without Douglas-4's immediate capitulation." *Id.* at 987 (record citations omitted). The Tenth Circuit stressed that, "[b]y contrast, the district court did exclude portions of an earlier 2006 letter which contained elements of "a classic settlement offer.'" (*Id*.) The Tenth Circuit held the district court had not abused its discretion in "distinguish[ing] between letters containing clear settlement offers and letters containing near-term demands for immediate compliance." (*Id*.)

The Nacchio letters were written by the defendants' insurer, and contain no demand for immediate compliance. The letters were written in response to demands by plaintiff's counsel, include the discussion of specific settlement amounts, and reflect classic settlement correspondence. The Nacchio letters are inadmissible pursuant to Fed.R.Evid. 408. Accordingly, the court grants defendants summary judgment as to Count 3 of the Amended Complaint.

With respect to the plaintiff's claim of interference with FMLA rights, the defendants present two arguments. First, they contend that when Kimzey returned from leave, he was assigned to the same or at least an equivalent position. Specifically, the defendants stress

that there were no differences in the job as to the pay, hours, or likelihood for advancement, whether Kimzey performed his work in maintenance, shipping and receiving, or processing. Second, they argue that the assignment of Kimzey to the processing line was not related to his use of FMLA leave. Rather, they argue, he was placed in that position because that was where they needed his attention, and because he had requested accommodation for his shoulder injury.

Under the FMLA, an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). To prevail on an interference or entitlement theory, the plaintiff must demonstrate: "(1) that he [or she] was entitled to FMLA leave, (2) that some adverse action by the employer interfered with his [or her] right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights." *Metzler v. Fed. Home Loan Bank*, 464 F.3d 1164, 1180 (10th Cir 2006) (quoting *Jones v. Denver Pub. Sch.*, 427 F.3d 1315, 1319 (10th Cir. 2005)). *See also Bass v*. Potter, 522 F.3d 1098, 1102 n. 5 (10th Cir.2008),

"On return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment." 29 C.F.R. § 825.214. Under 29 C.F.R. § 825.215(a), "[a]n equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." *See Keeler v. Aramark*, 2011 WL 3608698, *6 (D. Kan. 2011) ("[t]he regulation defining an equivalent position focuses on the factors of equivalent pay, equivalent benefits, and equivalent terms and conditions of employment"). Restoration to the same or equivalent employment "does not extend to de minimis,

intangible, or unmeasurable aspects of the job." 29 C.F.R. § 825.215(f)

The plaintiff's Response provides evidence that the processing line job was different in some respects. It was more physically demanding and less skilled, was somewhat more dangerous, was regarded by employees as having less prestige, provided less autonomy, and involved less interaction with persons outside the company. Given this evidence, a rational finder of fact could conclude that Kimzey did not return to the same position or its equivalent.[1]

Much of the discussion of the nature of Kimzey's employment by the defendants in their Reply (Dkt. 66, at 11-12) rests on the affidavit of Crouch, which was prepared after the plaintiff's summary judgment Response. As the Reply stresses, Kimzey worked for less than three days after returning from FMLA, and it may well be, as defendants contend, that the assignment to the processing line was only temporary in nature. But defendants were obligated to supply proof of this fact in their motion for summary judgment, not reserve it until after plaintiff's Response.

The defendants also cite *Montgomery v. Maryland*, 266 F.3d 334, 342 (4th Cir. 2001), *vacated on other gds.,* 535 U.S. 1075 (2002), in support of their argument, but that decision rests on the specific factual issues presented in the case. The court in *Montgomery* stressed that the plaintiff returning from FMLA leave had the same position — "Administrative Aide Stenographer" — that she had before, and had the same pay grade and increment level. Against this, her complaint that she originally performed "truly administrative" tasks, but after her leave was restricted to "answering the phone, taking messages, typing simple correspondence" failed to show more than a de minimis change in her working

[1] The jury *could* reach such a conclusion, but, given the evidence, it would hardly be *required* to do so. In his Response to defendant's Motion for Summary Judgment, Kimzey not only requests a trial on the merits, but indeed urges the court to grant summary judgment in his favor. (Dkt. 63, at 28, 36). This request comes well after the court's deadline for dispositive motions, and would serve to effectively cheat the defendants of the opportunity to respond to such a motion had it been properly presented to the court. More important, the request is not only procedurally incorrect, it is wrong substantively as well. A jury could find Crouch more credible than Kimzey, and conclude that the differences in Kimzey's work before and after his leave were relatively unimportant.

environment.

The court finds that the defendants have failed to establish beyond a reasonable doubt that Kimzey was returned to the same or similar position after his return from FMLA leave.

Similarly, a fact question exists as to whether the assignment to processing was related to Kimzey's FMLA leave. It may be that Crouch indeed would have assigned Kimzey to the processing line "regardless of his leave" because there was a need for work on the line and because Kimzey "did make a verbal request to Crouch that he not lift heavy weight." (Dkt. 66, at 14-15). But Kimzey denies making any such request, and otherwise indicates that it was extremely rare for him to work a full shift on the processing line. After he returned from leave, he was required to work on the line for three shifts in a row. Further, in the conversation that immediately preceded the termination, Crouch complained about having "put up with your crap." When asked to explain what he meant, Crouch's first response was Kimzey's "[m]issing work." Although Crouch then extended his answer to add other complaints about Kimzey, a rational fact-finder could conclude that Crouch was annoyed by Kimzey's FMLA leave, and assigned Kimzey to the processing line in part because of it.

IT IS ACCORDINGLY ORDERED this 28th day of December, 2016, that the defendants' Motion for Partial Summary Judgment (Dkt. 58) is granted in part and denied in part, as provided herein.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE